The next matter on our calendar is the Steamfitters Fund and Others v. Endo International, PLC. Thank you. Yes, thank you. Thanks. Thank you. One of the white cards. Good morning. Good morning. May it please the court, my name is Doug Willans and I represent the plaintiffs to individual, I'm sorry, institutional investors of Endo International. The district court erred in denying our post-judgment motion to file an amended complaint on futility grounds. Now, as far as securities fraud cases go, this is a relatively straightforward and not overly complex case. The fraud here is that the Endo purchased a company, Par Pharmaceuticals, and they intended to combine it with their existing and most important business division, Qualitest. And we allege simply that they failed to allege, I'm sorry, they failed to disclose that they were going to make fundamental changes to Qualitest's business model. And when those changes were later revealed to the market, the stock dropped and investors suffered a loss. That sounds to me like a strategy. Are you arguing that every business strategy has to be revealed in order to avoid being charged with misrepresentation or omission? We are not challenging the defendant's business judgment in making these changes to the company. What we're saying is when they make those fundamental changes to the company's most important business division, that they have a duty to disclose those to investors. They did say in several places that the consummation of the takeover of Par was transformational. I found that word more than once. Didn't that tell you that things were changing? One, we're not coming up here saying that they weren't allowed to make changes or a reasonable investor would not expect changes to occur. What we're saying here is transformational, as the defendants used it, is they're transforming their existing company into an industry leader. They're taking these two very disparate companies with different business models, putting them together, very few overlaps. Create magic, they said. They're going to maintain the magic that both of these companies had. What that doesn't tell to a reasonable investor is as soon as the transaction's closed, they're going to dismantle the very business that formed the basis of the company before that. Chief executive of Par become the chief executive of the combined company? That's true. That told you something about the direction they were going. That was not withheld, that information? No, certainly not. But what we're saying is when the transaction closed on September 28th, they're saying, oh, this is going to be transformational. We're going to have this bigger and stronger company with all of these benefits that the two companies bring. They're going to complement each other. And then three days after that, they essentially gut the existing company. That is something that in the context of what investors understood about that company, Qualitest, was significant material and not disclosed. And we say that is information they should have disclosed. It still feels to me like strategy, like they had a strategy. Why did they have to disclose the strategy? Well, one, because if you look at the context of how important this company was, it was 50% of their revenues. Analysts described it as a gold mine. So what we're saying is the Qualitest was an absolute gold mine. It was 50% of the company's revenues. So when you look at the statements that they're making about the company, they're giving investors a sense of stability and consistency following this very big merger. But what they're not telling them is that as soon as this is closed, that they're going to fire the two top salespeople, they're going to cut an entire regional sales force, and they're going to discontinue drugs. And we say that's not just business strategy. They're going to discontinue some drugs. Well, the way it turned out, certainly everything was cut on the Qualitest side, and everything pretty much stayed the same on the PAR side. And I think if you look how the investors reacted when those disclosures were made, that they were shocked and the stock dropped. And when the company said at the end of the class period, hey, we shifted early in the class period, we made this decision to shift the business model of Qualitest, the investors were surprised by that. Was that when the stock dropped, or did it drop when losses were reported? We alleged several what we would call for loss causation purposes, which is not an issue. There were several partial disclosures. There was certainly a disclosure in November. Again, this is 38 days after the transaction closed. They said, oh, by the way, we have this $91 million charge based on certain decisions that were made with respect to Qualitest. So we say the stock dropped after that because the market was rightly surprised that there was this huge charge. Yes, but we're saying investors were still in the dark as to what exactly caused that charge. Now, what our complaint alleges and what must be taken as true at the motion to dismiss stage is that we say it's because of the undisclosed gutting of Qualitest, that they dropped customers, they cut certain drugs, they got rid of the salespeople. Not surprisingly, that business is going to suffer. They didn't disclose it. Does the complaint allege that there was some reason to believe that the business strategy that was being adopted would be a failure? Does the complaint allege that there's some reason to believe that the management who is making these changes in strategy did not believe that they were going to be profitable? No, but that's not our case. They could have had the best intentions of making this maneuver. That's not what our case is. Our case is they failed to disclose it. They failed to disclose it to the market. And why did they fail to disclose it? Because they knew how the market would react. It's not that they didn't know this information. They had planned this from the beginning of the transaction. Are you alleging that they knew the market wouldn't like this transformation? Well, yes, I'm alleging based upon how they reacted when the truth came out that the stock dropped 39%. So if you look at why wouldn't they disclose this ahead of time, it's because investors were very keen on why and how Qualitas performed because it was such an important part of the business. So when you look at everything in context, the market certainly, you know, they didn't. Our theory is they didn't disclose this because they knew how the market would react. But when things got to the point where they were so bad, they said, oh, by the way, we had this shift in the Qualitas business model. The market reacted, and therefore the stock dropped as a result. It has nothing to do with the reasons, the business judgment as to why they make it. They could have sabotaged this business any way they want. Our fundamental argument is they failed to disclose those decisions to the investors. With respect to just with my limited time, if the court has any questions on the Item 303 claim, which we brought in the amended complaint in which there is certainly some overlap between the two, but the district court didn't even address the specifics of Item 303 claim. We laid out in our initial brief how we pled all the elements of that, and in our reply brief, we very specifically rebutted that there was no disclosure. Whether this was an internal business strategy or not, they disclosed nothing about it. They disclosed neither the general. If the court wants to take the position based on the Stratt McClure case that they don't have to disclose internal business judgments, they don't disclose anything specific or general. So it's our theory, and we submit that we also stated a disclosure-based claim under Item 303. You've reserved some time for rebuttal. Thank you, Your Honor. We'll hear from Endo. You can raise the podium, counsel. Thank you, Your Honor. Good morning, Your Honors, and may it please the court. My name is Roman Martinez, and I'm here on behalf of Endo and the individual defendants. A plaintiff's fraud theory in this case fails for two overarching reasons. First of all, none of Endo's statements was misleading or triggered any duty to disclose its internal business plans for how it was going to integrate PAR and Qualitas. Even so, Endo was transparent, and it actually told the market a lot about how PAR was going to reposition the generics business in light of the acquisition. Second, plaintiffs can't establish scienter. They allege no facts showing any conscious wrongdoing or recklessness by anyone, and they concede— Is that what you're arguing as a defense? The company just had bad judgment when they decided to give up the gold mine of the low-cost generics and switch to the high-barrier-to-entry drugs? I think that the facts pleaded in the complaint, which for purposes of this discussion we're assuming are true, I think they plead a complaint about bad judgment. I don't think they plead a complaint about securities fraud. And that's your defense, that it was just bad judgment? We didn't conceal anything? We just made a whopping bad mistake? Our defense is twofold. First of all, we didn't mislead anyone. And second of all, even if a reasonable investor may have been misled by the comments that were made, those comments were not made with scienter, with the intent to mislead. And let me just turn to the first point, because I think it's very important to be clear about what the legal standard that governs this fraud case is. And the legal standard, the baseline rule here, is that companies don't have a general obligation to disclose their business plans. As this Court and the Supreme Court have made clear, affirmative disclosure is only required when it's necessary to render certain other statements not misleading. And what this Court has repeatedly said in cases like the San Leandro case and the Stratton McClure case is that it's especially important not to create a disclosure obligation when we're talking about internal business strategies, because that's basically going to require companies to disclose to their competitors sort of their secret plans for maneuvering in the market. So here the question is not whether Endo failed to disclose something, but rather whether Endo had a duty to disclose the information in the first place. And we would respectfully submit that the answer is no, because none of the statements that Endo did make was misleading or triggered a duty to disclose. Now, plaintiffs rely basically on two sets of statements, vague assertions about maintaining the magic and also the assertion that Endo did make, which was that the PAR and QualiTest businesses would be complementary. But neither of these statements stated or implied that the company was not going to make any changes to QualiTest after the acquisition, and no reasonable investor would have interpreted the statements as promising that no changes would be forthcoming. Just to start with the maintain the magic statement, I mean, that is a classic generalized statement of corporate optimism. Companies make those kinds of statements all the time, and as this Court has repeatedly recognized in cases like the ECA case and others, those kind of generalized statements are non-actionable puffery. No reasonable investor would act on them. I would just submit, Your Honors, if your investment advisor called you up on the phone and said, hey, great news, I'm investing all your retirement savings in a company because the CEO told me he's going to maintain the magic there, I think you would probably decide to get a new investment advisor because that wouldn't be a reasonable approach to that investment. The other statements that they tend to rely on are statements about the complementarity about PAR and QualiTest. And it's certainly true that Endo said that PAR and QualiTest were going to be complementary. What it meant by that was that they provided different products, different portfolios, and had slightly different business strategies. They pretty much dumped the QualiTest part of the business. No, I don't think that's true at all, Your Honor. I don't think the complaint alleges that the QualiTest ceased providing revenues to the company. In fact, the documents that are cited in the complaint make clear that the company was counting on QualiTest to provide significant revenues going forward. That's the whole problem when the guidance had to be revised. It was revised because QualiTest had underperformed the expectations of the company. But that just shows that the company had expectations that QualiTest was going to continue to generate business. It's also not true, Your Honor, with respect to my friend on the other side, it's not true that the company didn't disclose the changes were forthcoming. On both the portfolio side, what products the business was going to continue to sell, the legacy QualiTest business, and on the personnel side, the company was actually quite transparent. With respect to the portfolio, Endo repeatedly made clear that after the acquisition, it was going to be looking at the portfolio of products and it was going to be optimizing, rebalancing, shifting the balance of products to take account of the PAR model. They said it was going to be transformational. Exactly. They said it was going to be transformational, and they said that the PAR acquisition was going to allow the company to reposition QualiTest. And if I could just point you to a couple of statements that were made during the class period, well before the end of the class period that my friend relies on. In September 15th on the conference call with investors, Endo said. What year was this? This is, sorry, in September 2015, and this is at JA53. Endo said, Endo emphasized, and this is what the complaint says, the likelihood of certain changes within the company, including pursuing optimization benefits with respect to the combined book of business. Optimization benefits means that we're going to look at the portfolio and we're going to change it because the company was concerned that the commodity products that QualiTest had traditionally been selling were facing increased pricing pressures and they were going to shift to the kinds of products that PAR was selling, not get rid of the QualiTest products, but shift the emphasis. In November 2015, they said the same thing. They said that the commodity products are facing downward pricing pressures, and it referred to Endo's ongoing portfolio and pipeline optimization process, which would involve prioritizing differentiated products instead of the commodity products. In other words, prioritizing the PAR type of products instead of QualiTest. Did they give enough information to investors that they were going to limit their gold mine of low-cost generics and bring in others? Do you think this information that you've just read is enough to give an early warning to investors? I think that those are just two examples. I have six or seven others. I think throughout this period, I think the company was transparent about the big picture issues. One, they said that the QualiTest legacy business, which they did like and which had been performing well, their analysis was that this business was facing increased pricing pressures. It was not going to be as profitable, perhaps, as it had been in the past. That was the whole strategic rationale for buying PAR. They wanted to diversify the products that they were selling and the businesses that they had because they thought there was pricing pressure on the QualiTest commodity model. They then bought PAR in, and they told this to the market. And they said, when we buy PAR, we're going to realize some synergies in the workforce. As you noted, Your Honor, they put the head of PAR in charge of the combined business, which was a clear signal. And they said repeatedly throughout the fall of 2015, we're going to change the portfolio. We're looking at the portfolio. We want to optimize the portfolio, and we want to emphasize the PAR products. So with respect to the portfolio and with respect to the personnel, the company was absolutely transparent. But you should only care about transparency if you think there was a duty to disclose in the first place. We don't think that duty arose. You're changing your whole business model. I think there's some duty to let the investors and future investors know that you're going to be a different kind of company, don't you? I think that there is no— Isn't that what the law would require? No, Your Honor, because I think the law from this court is very clear that when you have an internal business strategy, which is what we're talking about here, there's no—so the baseline is not that there's an obligation to disclose that. The court has placed very clear limits on that. Again, it's the San Leandro case, the Stratton McClure case. San Leandro makes clear that the outer limits of when you need to disclose an internal business strategy was the situation that came up in the Time Warner case. And that's basically when you are telling the market you're hyping strategy A when really you're considering strategy B. But that's not what happened here. We were not hyping one strategy and secretly considering another strategy. We were making generalized statements about maintaining the magic, and then we were telling the market what strategy we were actually going to pursue. And so for those reasons, there was no misleading statement here. But I think there's a second and very important independent reason why the decision below should be affirmed, and that has to do with Sienta. Here, there's no reason to believe that Endo was actually actively trying to deceive anyone, which is essentially what the other side has to prove. They need to prove an extreme—they need to allege an extreme departure from ordinary standards of care that approximates actual intent, and there's nothing like that here. Most importantly, Your Honor, there's no direct evidence of any conscious wrongdoing. There's no objective lie in this case. There's no smoking gun email that reveals— This is Judge Winter in New Haven. On the Sienta issue, would we have to remand to allow an amendment to the complaint if we went off on that grounds? Absolutely not, Your Honor. The Sienta issue was briefed below in our motion to dismiss. Judge Furman did not reach it because he thought there were so many other good reasons that the complaint was futile, that the proposed complaint was futile. We briefed Sienta as well in our—with respect to the third amended complaint. It raises a pure legal issue of the sufficiency of the allegations, and we think that this Court could easily resolve that, and if it wants to, it might be an even easier basis to resolve this case than on the no misleading statement grounds. Well, Endo's defense is they weren't bad people. They were just stupid managers. That's absolutely not our point, Your Honor. We do, as the Court knows— How would you describe it? We do have to—what I'm describing is that the ordinary rule here is we have to accept their allegations of bad business judgment as given for purposes of the argument here. Our point is that even if you take those allegations as given, they haven't stated a claim for fraud because there was no duty to disclose, and in fact, even if there was a duty, we actually satisfied it. Second, they haven't shown that we acted in bad faith, that we acted with Sienta. The bottom line is, at worst, we made a bad business decision, but there's no allegation of securities fraud here. Let me ask you extra record. Has the stock regained its previous position after the class period? Your Honor, I'm not sure exactly where the stock is today. I think that the stock drop was precipitous at that point. Obviously, we're limited to the complaint as—to the facts put in the complaint. We ask the Court to affirm. Thank you, Counsel. You've retained two minutes for rebuttal. Why don't you speak about Sienta before you go further? Certainly, and I guess I would start that I agree with what Judge Winter said. Sienta was not the basis of the Court's decision. We did not raise it in the first instance, so I think if you're going to even—I would not consider Sienta at this juncture. It would be better to remand and let the Court—it's not just a pure question of law. There's a weighing— It was argued in the district court? It was argued in the district court, yes, but it did not form the basis of the district court's decision, especially on the post-judgment motion. But I would still say we do allege sufficiently— The post-judgment motion was a motion to amend— To amend the complaint? —the fourth complaint. Correct, which was the first complaint after the only dismissal order in this case. But I would suggest that we do allege Sienta here based upon a reckless failure in the face of a known or obvious duty to disclose. And again, we allege that they were facts known. The Sienta here, and it dovetails a lot with the falsity, is that they did not disclose, not because they didn't know the underlying information. They did not disclose because they knew the impact that it would have on the market. You mean they intentionally lost money? No. What I'm saying is at a minimum they didn't disclose this information because they knew how the market would react as we— Because they knew it was a bad idea? Why wouldn't they disclose? Well, they didn't disclose because, you know, investors had an expectation based upon the statements that they made that there were not going to be— I'm getting at what you say, that they knew. What I'm saying is they knew the underlying information about the changes that they were making to Qualitest and did not disclose those to the market. But they did not know the effect. They did not know it would cause the stock to drop. Well, I certainly think they knew the effect it would have on the company's business in that when you fire the top two salespeople, when you discontinue and drop a number of drugs, when you drop a number of business, there is certainly going to be a negative reaction to that. If I could just address one question that you raised is when you asked my opposing counsel whether this was enough, it clearly wasn't enough. Talking about optimization of drugs, that doesn't give investors any inkling that these very fundamental changes to the most important business segment of the company were going to drastically change. Nothing that they said. If you look at the statements, just take the September 28 statements, which is the day they announced that the transaction closed. They're still talking very positively. They're creating a very false impression about what this company is going to look like. Three days later, they fire all these people. Nothing that investors were told about that. They had any inkling that they knew that was going to happen. Not until when they said at the very end, oh, we had this shift in business models, that the market was very surprised and the stock dropped. There was no transparency here. Certainly, as the class parade went on and the effects were happening in November, they announced the $91 million charge, and yet they still didn't tell investors that it was the result of the decisions that they made earlier. Unless the panel has any other questions, I—